The next case today is Spectrum Northeast, LLC et al. versus Aaron M. Frey, appeal number 20-2142. Attorney Souter, please introduce yourself for the record and proceed with your argument. Good morning, Your Honors. Paul Souter, Assistant Attorney General on behalf of the Attorney General of Maine, Aaron Frey. Judge Thompson, may I request three minutes of rebuttal time? Yes. Thank you, Your Honors. And may it please the Court. The legal question in this case is straightforward. When Congress passed the Cable Act, prohibiting states like Maine from regulating rates for the provision of cable service, did Congress express a, quote, clear and manifest intent to preempt Maine's historic police powers to protect its own citizen consumers from being nickel-and-dimed by cable companies post-termination charges? Congress did no such thing. This Court has stated that express preemption occurs, quote, only when a federal statute explicitly confirms Congress's intention to preempt state law and defines the extent of that preclusion. Here, the text, structure, history, and purpose of the Cable Act indicate in three independent ways that Congress did not manifestly preempt Maine's ability to enact its pro rata law. First, the term rates is defined nowhere in the Cable Act, and so it would be inappropriate to read the term so broadly as to apply to the discrete situation that Maine's pro rata law governs. Second, is the text and structure of the Cable Act itself. The Cable Act only prohibits rate regulation for the provision of cable service. The prohibition does not apply to regulation of cable companies after said companies cease to supply cable to their former customers. This is further supported by Section 552D of the Cable Act, which reaffirms Congress's support for state consumer protection and customer service laws such as Maine's. Finally, even if the Attorney General's reading of the Cable Act was not superior to charters, which it is, the AG's reading need only be a reasonable or plausible interpretation of the statute as the presumption against federal preemption of state police powers instructs that the strong medicine of preemption should not apply where Congress's intent is not explicit. Congress is free again and again to define the scope of a preemptive act, but once a court holds a state law is preempted for the state, that's the ballgame and there is no recourse. In this case, charter bears the burden of demonstrating preemption, and it has not done so. Even under charter's own chosen definition of the term rate, the ratio of price to units sold, Maine's pro rata law does nothing to alter what charter chooses to charge its customers on an ongoing basis. Judge Dyke, just speaking for myself, I don't find these analogies to supermarket sales of loaves of bread to be particularly helpful. Has either party considered asking the FCC for its views on whether this constitutes rate regulation or not? And wouldn't it be helpful to us to know what the FCC's views are about this? Judge Dyke, I'm not aware of either party asking the FCC. The attorney general's office certainly hasn't. I'm not sure their input is necessary in this case in that a federal agency, and I think this sort of comes out of the Mozilla line of cases in the D.C. Circuit, an agency can't give greater preemptive power to a federal statute that doesn't actually exist in the statute as written by Congress. So I suppose the FCC's opinion doesn't harm the analysis here, but I'm not sure it would be particularly helpful. There are a lot of cases all over the lot, many of which weren't cited in the briefs about preemption, particularly in the cellular area. What is your view? Suppose this were a connection fee, an initial connection fee. Could the state regulate that? I think the state probably could regulate a connection fee issue, Judge Dyke, because I'm not sure a connection fee is a rate for the provision of service of cable. I do think it's a closer call because the connection fee, of course, occurs when cable is being provided, and the prepositional phrase for the provision of service certainly works in its favor there, whereas it works against Charter's argument here where cable has completely been terminated. Just to explain, is your view that a cable company cannot have a monthly rate? No, Judge Barron. A cable company certainly can choose whatever rate it desires to charge. That's a different point. I just want to know, can it have a monthly rate as opposed to a daily rate? Yes, but I think there's a caveat to that there, Judge Barron, because I think the idea of a monthly rate is actually a little bit of a misnomer. Rate itself is really the relationship to a price in the unit sold, and I think an analogy to an area where we're a lot more familiar with rates might make more sense, and that would be the idea of a speed limit or your rate of travel on a highway. What about a bulk rate? That's a pretty common type of rate. If you buy in bulk, we charge you less than if you buy in individual quantities. So I guess the question is if this is a form of bulk rate set by the cable operator, are you saying they can't have this bulk rate, and if so, does that then suggest that maybe it is rate regulation? I don't think so, Judge Barron, because if you have a bulk rate, a cable company could certainly create a contract where they charge by the month, and then in the final month they charge by the day, and that would prevent them from having to apply their bulk rate to an individual customer, but I do think it's important to focus on the fact that a rate really is the relationship between price and unit. Do they have a quarterly rate? I think they could have a quarterly rate, Judge Thompson, and I think the main legislature, if cable companies began charging by the quarter, the main legislature would certainly be free to pass a similar statute instructing cable companies to apply their quarterly rate only to a final certain aspect of their service. That was part of the point that we made in our brief, that a cable company could theoretically have a yearly rate or a decade rate, and the question is whether Congress intended to stop states from protecting their citizen consumers from having to pay for cable that they don't receive days, weeks, months after cable stops flowing to their cable boxes. Go ahead, Judge Dyke. If this were a cellular case, this would be rate regulation, right, under the Southwestern Bell case, and there are several other cases in California courts and the other circuits, right? I'm not sure if it would be, Judge Dyke. I think it would certainly be prohibited by the Communications Act, because the Communications… Four minutes remaining. Thank you, thank you, because the Communications Act uses slightly different text from the Cable Act, but with Southwestern Bell and those line of cases, that was states attempting to tell cell phone companies that they couldn't bill in whole minute increments. That would affect someone's ongoing rate, not just one discrete instance, but it would affect every bill they receive in their subscription, and under Maine's statute… What I'm saying is your distinction of the cellular cases has to rest here on the provision of service language, right? I think that is probably the most helpful distinction, but I do think it's important to note that when rate regulation occurs, if a state attempts to cap a rate, a customer who benefits from that capped rate will benefit every single month that they have to pay their bill, so if I have a relationship with my cable company for five months and you have a relationship for five years, you'll benefit more from that capped rate regulation. Maine's pro rata statute actually affects you the same way it would affect me, regardless of how long our subscription to the cable company lasted. Are you suggesting you could do a pro… under the Southwestern case, you could have framed it as a pro rata state regulation that you simply have to pay them back for any usage less than the minute long? No, I don't believe so, Judge Barron, because… Why not? Because here, in theory, your position here is that although you want them to have to pay pro rata for each day they didn't use, your theory would suggest that they could do it if it was, you know, if you stop at 8 o'clock, I want my four hours back before midnight. No, I understood Judge Barron, and I do think the difference in the Southwestern Bell case is that billing by the whole minute, that is how the cell phone companies charge their customers for the sort of individual packaged product that they were getting, in that case, phone calls, so I think the best analogy to Southwest Bell in the cable context would be if Maine attempted to tell cable companies what they could charge for a pay-per-view service or a specific channel. That would certainly affect someone's month or someone's billing rate on a monthly basis. Are you suggesting then that you could have done a pro rata law in the Southwest Bell context for any caller who could show they were charged for the minute but had only been on for 30 seconds, that they have to be paid back 30 seconds? No, I'm suggesting that would not be appropriate. And why? Why is that different than this? If that's not appropriate, how is this different? Is that because for the provision of services and there's no other distinction? For two reasons, Judge Barron. Yes, for the provision of service argument, but also because charging by the minute is something that affects every single month of service that you would pay your cell phone bill. That affects your rates that you would have to pay your cell phone company throughout the relationship of your subscription. So the better analogy for Southwestern Bell would be a pro rata service that requires the cell phone company to not continue charging you for the final week of your month of cell phone service. But the minute rate doesn't just affect one month of your bill. It affects every single month that you would have to pay your bill. The last thing I would point out, and I really want to sort of hone in on what it is to be a rate. So just for example, traveling speed on a highway. If a highway post signs that says you may only travel 60 miles per hour, 60 miles is not a rate. Per hour is not a rate. The rate is 60 miles per hour. If I then went to that highway and posted new signs that say you may not travel more than one mile per minute, I certainly haven't changed the rate of speed at which you're allowed to travel. And that's all we're asking Charter to do to its former customers is apply the rate that it has chosen to the final partial month of service. Thank you, Your Honors. Any additional questions? Thank you, Counselor. Attorney Hellman should unmute his device and introduce himself on the record to proceed. Good morning, Your Honors. I'm Matthew Hellman on behalf of the appellees, Spectrum Northeast and Charter Communications. Thank you and may it please the court. I'd like to begin where Judge Barron was in his questioning because I think he stated the issue exactly correct. Charter wants to sell its service by the month, a bulk price, a bulk rate. Maine requires Charter to sell its service by the day. That is rate regulation. Do you charge for a full month if the customer hooks up, say, June 20th? The month is defined, if you start your service on the 20th of the month, then a month is the 20th to the 20th. So do you pro-rate the bill? My understanding is that it is charged by the month so that the customer is paying for 30 days worth of service when they start on June 20th. That runs to July 20th, if that answers your question. So every customer's bill ends on a different month, day of the month? You have a billing cycle that's key to when you started the service. That's my understanding of the practice. Charter wants to sell its service by the month because it believes that it offers competitive advantages. The theory of the Cable Act is that it is for the marketplace to decide whether that's a good way of selling the service or a bad way of selling the service, where there is effective competition in the marketplace, which there is here. What are the competitive advantages of selling it for 30 days? Other than that, you get to keep the amount of money that they don't use the service for. It provides predictability, for one thing. It puts us on par with our competitors, DISH, Netflix. All of that would be the case if it was pro-rated. It would be predictable. You know that the most you'd be asked to pay every 30 days, but you know you get a pro-rated share. You'd be on the same par as your competitors. Everybody would be subject to the pro-rated share. With typical bulk pricing, I thought the advantage was something like you get an economy of scale or it's cheaper to sell it in bulk or something like that, but this has nothing to do with that. With respect, Your Honor, knowing that you have a 30-day bundle or payment coming in, as opposed to a 22-day payment if the customer decides to cancel, does provide predictability. I suppose there could be a debate about whether that's the best policy, whether that makes good business sense, whether there's another kind of predictability that's better, but all of those are questions that Congress said the marketplace is the decider of, not the states, not even the FCC, where there's effective competition, and that's the theory of what the Cable Act and Section 543 in particular does. It says rates for the provision of cable services. What are we to do with for the provision of cable services when you're not providing a cable service for half of a month? This is, I think, the best way to think about that, Your Honor. Cable service is agreed to at the start of the month. When you say, I want service from charter, you're saying, I want a month's worth of service for charter. If the customer says on day five, you know what? I've actually seen my HBO show. I don't want the service anymore. With respect, what the customer is saying is, I don't want to pay for the 30 days that I have agreed to pay for. That is the provision of cable, and it's very different than the Finneran case, which my friend on the other side, I think, adverted to. That was a case where what was at issue was a downgrade charge, a charge not for the provision of cable, not for the cable rate itself, but a separate and additional charge. The court said there that's different than the rates for cable itself. Perhaps that's different, but I think a key point on this is, whatever the logic of Finneran was, it's distinguishable, but Congress responded to Finneran by amending Section 543 to include as a rate downgrade charges. That's 543B5C. Congress adopted an expansive conception of what a rate is and said that those kinds of charges are not amenable. The state may not regulate those kinds of charges where there is effective competition in the marketplace, as there is here. This is provision of cable, just in the same way that if you go to the supermarket and you see that six pack of cola, and you say, I'd really only like to buy three, not the six. That is determining what is provided, what the deal is between the parties. This is provision of cable service, and Congress removed all doubt about that when it amended Section 543. Would we benefit, possibly, from hearing from the FCC about what its view is, as to whether this is a regulation of rates for the provision of service? Your Honor, I don't see any need for that because the statute is clear, and for all the reasons that Judge Levy gave in his opinion. And the other thing I'd point out, I think Your Honor adverted to this as well, in Southwestern Bell, the FCC said whole minute billing is rate regulation. This is whole month billing. It's rate regulation as well. I think I heard my friend on the other side say, well, that's an ongoing billing, where this is a lesser amount of rate regulation. A lesser amount of rate regulation is preempted as much as a greater amount of rate regulation under Section 543. So you could bill yearly? As a matter of business choice, I suppose that's possible. Now, of course, Congress thought that the market would constrain billing practices that nobody would want to adhere to, and I suspect that if Charter thought that a yearly billing practice was a good idea, they would quickly find out that it wasn't. But it's the market that determines whether or not something is competitive, not whether a state chooses to allow it or not. And if I could, just to go back to this bulk concept, it's not just that the main act requires Charter to sell its service by the day. It requires Charter to sell its service by the day at that pro rata monthly rate. Normally, when a consumer agrees to buy less of something, not in bulk, the per unit price is higher. We talked about it in the briefs. I hope it's helpful. The six pack of soda for $6, while the individual cans are $1.50 up front. The reason those cans are $1.50 is because the store has made a judgment that it wants to get more per can if it's not going to sell as many. Charter has exactly the same kind of logic, and it's allowed to conclude that under the Cable Act's determination that effective competition is the regulator. Can't you just raise the rate if the pro rata thing comes in so you effectively get the same amount of cash each month in? You're pretty good at making those calculations, I would think. Perhaps as a matter of math, but not as a matter of law, Your Honor, because that kind of thinking would make it the case that Maine could pass a law that says all cable rates must be cut by $5 a month, and then Maine could come in and defend and say, No, no, no. The question is, you were just saying this has to be rate regulation because you were being forced to actually set the rate, the amount. I'm just saying that's not true. Nothing in the Maine law prohibits you from, in response to this, raising the rate amount in order to make up for the pro rata share. That doesn't prove it one way or the other, whether it's rate regulation. It just suggests that it's not the case that you're barred from doing that. You're correct that we're not barred from doing that, Your Honor, but for the legal question before the court, does that tell us whether or not this is rate regulation? I'm just saying that if it did bar you from doing that, it would be rate regulation. Yes, but also it would be rate regulation even if it didn't bar us from doing it because… It would have nothing to do with any limitation on your ability to do that. Correct. It's rate regulation regardless of what that next here non-existent provision of the statute says. It seems to me you could have a good argument perhaps that a termination fee or something like this is rate regulation, but there's an argument also that when Congress passed the statute, it wasn't thinking about these kinds of details. It was thinking about a state law which regulated the overall monthly rates for basic or premium service. Doesn't the context of the enactment of the statute and the history suggest that they were concerned with that kind of basic regulation rather than the details of termination fees or connection fees or things of that sort? I don't think that's correct, Your Honor. The prohibition is absolute. It includes, as the D.C. Circuit recognized in the Time Warner case even before Congress further amended the statute, rate structure as well as regulation of rates. I don't think that there's any room for… Four minutes remaining. and that daily rate has to be the equivalent of the monthly rate. That's just in the heartland of what rate regulation is. You just stated it the same way. It's not a requirement to have to charge by the day. You can charge by the month. You just have to provide it for anybody who terminates early. So for customers who aren't terminating early, you're free to charge them by the month, not by the day. Correct, Your Honor. There's a subset of consumers, of subscribers, every month who are effectively charged by the day if they are terminating subscribers. That's how I would describe it. I want to say just a little bit about consumer protection as well. Rate regulation cannot be dressed up as consumer protection to avoid the preemption that Section 543 requires. As Judge Levy pointed out, this is regulation that directly regulates rates. Again, the example that I hope is helpful to the court is we've talked about the six-pack of soda. Rate regulation is requiring the store to sell the six-pack to allow the consumer to buy three of the six-pack instead of the whole six and to do it at the $1 a can price, that is the bulk price. Consumer protection is if three of those cans turn out to be empty and the consumer didn't get what he paid for or she paid for and perhaps there's some room for the state to regulate in that instance. Here, the consumer is getting exactly what he or she paid for, the month's worth of service, but wants a different deal, wants a different rate. That is not consumer protection. That is rate regulation. At page 79 of the House report that accompanies the Cable Act, and Judge Dike, I think this may also be responsive to what you were just asking about, Congress made the point that a state may not regulate the rates for cable service and attempt to justify such regulation as a consumer protection measure. That language fits this case to a T. That makes it sound a little bit like the Lemon Law is rate regulation. The idea would be that if they wanted to sell you six cans of soda and they made it as a term of service that if three are empty, you can't get a refund. The state would be barred because it would be engaged in rate regulation if it said you can't do that to the seller. That seems a little strange because that's the provision of service point here, which is that you said up front we're going to charge you even if you don't use the service. The state says you can't do it that way, and you say that's rate regulation. No, Your Honor. If the provider isn't providing what he or she promised, if there were a service outage or something like that, then that kind of rule that says the customer gets the month that he or she paid for, that's consumer protection. It's a different deal entirely if the customer is saying I know that you want to sell me this car. This car comes with air conditioning and the navigation system, but I want you to take the navigation system out or something like that and give me that car. That's what I want. State law says you have to do that. That's the analogy to what we have here. It seems like the consumer is saying I want to pay for a service that I'm being provided as opposed to pay for something that I'm not getting. If I understand your question, Your Honor, the situation where there's an outage or something like that, there's a month worth of cable the person is entitled to and has agreed to pay for, both entitled to and agreed to accept. If there's an outage or some problem with delivering that service, we're not disputing that consumer protection laws can say the consumer has to be made whole for the month of service that he or she bargained for, but this is really the opposite. This is the inverse. The consumer is saying yes, I've agreed to pay for a month's worth of service, but now that I'm 10 days in, I don't need to watch cable anymore. I got to see what I wanted to see, so I'd rather just get 10 days for $10 instead of 30 days for $30. Charter could choose to do that if it wanted to, if it thought that was a good business and the market thought that was a good thing to do, but it is not Maine's prerogative to require a cable operator to do that where they face effective competition in the marketplace. When this legislation was enacted, there was state regulation of cable rates, correct? Concerns about that is what led to this legislation, am I right about that? That's certainly part of the story, yes, Your Honor. What kinds of state regulation were involved that led to the legislation? I think the best answer I can give you on that is, as you can see from the effective competition language in Section 543, there was a concern about overregulation and patchworks of regulation, which would be inappropriate at least where a finding of effective competition existed in that marketplace. So this was Congress's way of saying, there's a room for states to regulate and there's a bunch of restrictions on how they can do that even apart from effective competition, but once there's effective competition for this kind of provision of cable service, that is where the state and the FCC and the franchising authority, Congress made the judgment, could be right, could be wrong, but it was Congress's judgment that it was the market that determines what rates and effective regulation of rates work and don't work. But that wasn't my question, my question is what were the states doing that led to the legislation? What kinds of regulation were they engaged in? The basic monthly charge regulation or some other kind of regulation that would be similar to this? I don't know if there's an example that explains whether or not this particular kind of rate regulation was at issue, but when Congress writes a term like rate regulation, it's broad and capacious and the prohibition is absolute at least where there's effective competition. Congress doesn't have to specify every way or predict every way a state might choose to regulate rates in order to have a blanket prohibition on it. We have some statutes where it does prohibit rate regulation, but this one is unique in that it has that other for the provision of cable services. That's correct, but what we're talking about here is the regulation of the rate for provision of cable services, not an extra charge, the charge is $50 a month, this is regulating that rate, requiring it to be by the day where there's a terminated subscriber and to specify the amount by the day, namely the pro rata of the monthly rate. This is provision of cable service. It was back when the Cable Act was enacted. Any doubt about that is certainly clear after Finneran where Congress made clear that even a downgrade charge is part of what the rate is. Again, the prohibition is absolute when it comes to rate regulation, including prohibition of regulation of rate structure, which is 543D. Again, I don't see anything from the other side even attempting to rebut how this could not be regulation of charter's rate structure. Thank you, Mr. Hellman. Thank you. At this time, Attorney Hellman should mute his audio and video, and Attorney Souter, you can reintroduce yourself on the record to proceed. Thank you, Your Honors. Paul Souter, Assistant Attorney General on behalf of the Attorney General of Maine. I just have four brief points that I would like to make in rebuttal as well as an answer to Judge Thompson's opening question to Charter's counsel. Attorney Hellman noted something along the lines that if Maine had a statute that provided a $5 monthly rebate, that would be rate regulation. That's a similar argument that he makes to footnote six in his brief, and of course that would be rate regulation. We don't concede that. That is nothing like Maine's pro rata statute at issue. Second, Attorney Hellman focused a lot on the deregulatory nature of the Cable Act and the freedom of the cable market. Under Charter's reading of the statute, consumers have 12 discrete days to cancel their cable service penalty free. Under Maine's reading of the statute, consumers can move about the cable market as they choose, penalty free. So to the extent that Congress was focused on the free market of cable, the Attorney General's reading of the statute is better. Third, Attorney Hellman focused on the fact that Finneran involved a downgrade charge, and while that is a factual distinction between Finneran and this case, that's not what the Second Circuit focused on. The Second Circuit focused on the for the provision of service language, and it explicitly said that to charge when cable is being downgraded or removed is a linguistically unlikely proposition. And Charter faces that same linguistically unlikely proposition here. Fourth and finally, to Judge Dyke's point about what Congress was really thinking about when it passed the Cable Act, it seems quite clear that Congress was focused on preventing states from just setting rates for what people have to pay for their cable service. And I actually think what is helpful in this case is the presumption against freedom. What kinds of state legislation existed before the Cable Act and to which the Act was directed? Similar to Attorney Hellman, Your Honor, I don't have that in front of me, but it seems quite clear that when you read the language of the statute that Congress cannot regulate rates for the provision of cable service, it's not focused on this type of consumer protection, customer service measure. Congress adds 552D, which I concede would not save Maine if it was completely preempted by 543A. But I think the important thing here is that there is a default statutory construction, and that's the presumption against preemption. The case from the First Circuit that this most reminds me of is the O'Connor v. Oakers dairy case. The Maine legislature wrote a statute regarding the minimum wage, and there were two potential ways to interpret that statute. And the court's opinion in that case said that it was a tough case, but Maine provides a default construction. And that's what the presumption against preemption does here. And I would encourage the court to apply it if it doesn't think that the Attorney General's reading of the statute is the superior or clearly superior reading, which we assert that it is. Just one answer to Judge Thompson's original question regarding whether Charter prorates its monthly service at the beginning of a customer service. I concede I don't know how Charter practices this in the real world, but in the district court, in the preliminary injunction briefing, we did submit a document where Charter's contract notes that it will or can prorate the first month of service. So whether or not Charter actually engages in that, I can't say. But certainly they advertise to their customers that they're happy and able to do so at the beginning of their service. Thank you. Thank you, Your Honor. Any additional questions? Okay, thank you, Counselor. Thank you. That concludes argument in this case. Attorney Souter and Attorney Hellman, you should disconnect from the hearing at this time.